Okay, this case has been set for 15 minutes per side. And for appellant, we have Gail Coleman. And for appellee, we have Transgesto Gonzalez. And we appreciate both of you being here. And this case is a very tricky and complex case where under our standard protocols, it was set for 15 minutes per side. But I'm not going to be entirely tough on that. If either of you need a little, another minute or two. I appreciate that, Your Honor. May it please the Court, I am Gail Coleman for the Equal Employment Opportunity Commission. And I would like to try to reserve six minutes for rebuttal. At issue in this case is whether the growers can be liable for conduct that occurred outside the orchards. And whether this lawsuit, which is premised in part on the belief that they can, is frivolous, unreasonable, or without foundation. In ruling against the EEOC, the District Court made errors of law and of fact. The Court's first error occurred in the motion to dismiss, where the Court held that the growers could not be liable as joint employers for anything that happened outside the orchards. The joint employer test looks at whether entities have shared control over the terms and conditions of employment. When looking at shared control, the Court is supposed to look at the reality of the situation, not simply at the language of a contract. In Pacific Maritime, which is persuasive authority in this circuit, the Court laid out many different factors that should be considered for, that could be considered for shared control, and said it all depends on the context. Here the Court's fundamental error was looking only at what was in the H2A agreements. The Court said that the EEOC had not alleged anything in the First Amendment complaint that would support a finding that the growers shared control over anything that happened outside the orchards. This statement was untrue. The Court ignored factual allegations. In paragraphs 11 and 19 of the First Amendment complaint, the EEOC alleged that the growers owned or controlled housing and transportation. In Torres Lopez, which was an agricultural case just like this one, the Court held that ownership means that growers can likely prevent labor law violations. Now, it's true that in Torres Lopez the ownership involved ownership of the land where things were being grown, but there is no principled reason to distinguish ownership of worker housing. In particular, here where we have foreign, impoverished foreign workers brought over who are completely dependent on their employers for their housing. Let me interrupt you for a minute, Counsel. The growers paid an extra surcharge to Global to make sure that Global took care of the housing and transportation. And you cited some cases to us. How does this cut with Rase v. Remington, the Seventh Circuit case? Well, first of all, in Rase v. Remington, there was evidence that the growers and the other entity had agreed that there would be no housing provided, which is very different from here. And then, even though the Court here denied us discovery into questions of housing and ownership and control, we nevertheless did learn in discovery that Valley Fruit actually did own the Royal City House, and there was evidence that Valley Fruit retained control and was responsible for the maintenance in that house. We don't know about the rest of the housing because we weren't allowed to investigate. But certainly, given what we found out later in discovery, it was not an untrue or frivolous or certainly implausible allegation that the growers here did own and or control the housing. Additionally, in paragraphs 10 and 18 of the First Amendment complaint, we allege that the growers participated in the preparation of payroll and the payment of wages. Now, that is not what the H-2A agreement said would happen. But again, the Court is supposed to look at the reality, not just what the agreement said, but what actually happened on the ground. And at a motion to dismiss, the Court is required to believe the EEOC's allegations. And then finally, with respect to whether the growers knew or should have known of what was going on, paragraphs 132, 140 and 168 allege that claimants complained to the growers about their living situation, their unsafe transportation and their unpaid or late wages. In discovery later, we learned that Narong Srinongkot, who was a Thai claimant, but he spoke English well enough that he served as an interpreter, and he testified that he told the growers. He specifically told the growers about what was going on. Additionally, we learned in discovery that the growers actually visited the houses and that they were there on the fields every day when the claimants got on and off the buses and saw for themselves that the transportation was overcrowded and unsafe. So what the EEOC alleged and what we believe discovery showed and what further targeted discovery, which was denied to us, would have confirmed is that the growers knew what was going on, had some control over what was going on, but chose to stick their heads in the ground. And they did this on the basis of race or national origin. And our evidence for that also happened later in discovery, but that was that when Global told the growers it was going out to recruit workers for them, Global said to them, we are going to go get Thai claimants and the reason for that is that in our experience, the Thai claimants work very hard, they are compliant, they won't be complaining, they won't sue you, unlike Mexican workers. And the growers assented to that. So they knew exactly what was going on and they knew why they were getting the Thai workers and that certainly was a red flag indicating that they should have gone to see what was going on. We also were denied discovery into whether the growers were aware of the fact that prior to these contracts, Global had been in trouble with state and federal authorities for housing violations, for other H-2A violations, and whether that should have put the growers on notice so that they would check up on what was going on. Counsel, could I interject a question? Of course. Just to clarify the government's position. Are you saying that the record, the allegations as they were made, initially were adequate to show a joint employer? Absolutely. So it was an error to dismiss the claims? That is absolutely correct. But could that motion to dismiss at that stage have been denied without prejudice to it being renewed in a motion for judgment after? Yes, of course it could have been. But it was granted erroneously. And then that erroneous dismissal of everything that happened outside the orchards had spillover effects which poisoned the rest of this litigation. For example, with respect to summary judgment, the dismissal order cut the EEOC's hostile work environment claim in half. It lopped off everything that happened outside the orchards. So the claim looked weaker. We still think, as we explained in our briefs, that what happened on the orchards was enough standing alone to support a hostile work environment claim. For example, the outrageous quotas. There is evidence at page 1681 of the excerpts of records that the standard quota in the industry was three to four bins per day. And then at page 1063, we see that the growers were imposing quotas on the tie claimants, only on the tie claimants, of 18 to 20 bins per day. So we do think that that was enough. But then going beyond the summary judgment, when it came time to award attorneys' fees, the Court again relied on this ruling. There were two primary grounds on which the Court awarded attorneys' fees. One is it said that the EEOC's joint employer argument was frivolous, which we don't agree for all the reasons I've just said. But in addition, on summary judgment, the Court denied summary judgment on what was left of the joint employer theory. So how could the theory have been frivolous at the outset? The other thing the Court relied upon was it assessed the EEOC's administrative investigation and said that was inadequate, and therefore this litigation was frivolous. Now, with all due respect, Christiansburg has nothing to do with an administrative investigation. Christiansburg is about whether litigation itself is frivolous, unreasonable, or without foundation. And for EEOC litigation, just like for any private litigation, that should be assessed based on what happens there. When the EEOC was given authority in 1964 in Title VII, we were given instructions to investigate. We were told to take charges, to investigate, to make a reasonable cause determination, and then, if necessary, to conciliate. The purpose of the investigation was to set all of that up to promote voluntary compliance. And that is why we do our investigation. In 1972, we were given litigation authority, but there was nothing said and no requirement imposed that, with this litigation authority, we had to do anything different with our investigation. There are policy reasons why this Court should not be second-guessing our investigation, and I would point out that no court of appeals has ever awarded attorneys' fees against the Additionally, if a court were to go back and look for the purpose of attorneys' fees, that would change the nature of our investigations. We would always have to be looking over our shoulder at how a court would assess it down the road at the end of possible litigation. It would slow things down. It would interfere with an already overburdened agency, and it would interfere with the ability to get voluntary compliance. Counsel, may I interject a question? At the outset, you said you wanted to keep six minutes for about a year down the road. I will sit down. Thank you. And I'll end up giving both you and Mr. Gonzalez, if you'd like, an extra two minutes. Thank you, Your Honor. Good morning, and may it please the Court. Justo Guadalupe Gonzalez of Stokes Lawrence for Green Acre Farms and Valley Fruit Orchards. I'm going to refer to the appellees as the growers, which is the appropriate term for their operations in the agricultural industry. Of the four rulings the EEOC appeals, two are reviewed de novo and two for an abuse of discretion. We respectfully submit that regardless of the standard of review, the growers submit that the answer to each question is the same. Review the record and affirm. Before continuing, I'd like to address the record that was before the district court below and the record that the EEOC has relied upon on appeal. Growers submitted a color-coded excerpt of the EEOC's opening brief as a reference tool. The red color-coded highlights the EEOC's reliance on an uncontested record developed after default on default proceedings against Global after the growers had been dismissed from the case and after they had been awarded their fees as prevailing defendants. We submit that the EEOC's reliance on that post-grower dismissal record is improper and it's misleading in this appeal since none of that was before the district court on the issues that are actually before this court on appeal. But wouldn't we have to take into account what the EEOC learned later on the theory that well, perhaps they could have amended the complaint had the district court granted them leave to do so? They never moved to do so. They conducted discovery in the case. They had ample opportunity to depose witnesses, to produce their own witnesses. Well, I'm talking about at the time your client's motion was granted, right, did the EEOC not say, hey, please, district court, if you don't find these allegations sufficient, at least give us leave to amend? And I thought the court said, no, I'm dismissing the non-orchard-related matters without, with prejudice, right? Correct, Your Honor. I'm sorry. I misunderstood the court's question. The issue on the first, on the first amended complaint was the absolute paucity of any plausible facts that could give rise to a reasonable inference that either green acre farms or valley fruit orchards could be liable as a John O'Leary. That's why I'm saying that facts, just because they were developed later in the litigation, that doesn't mean that, you're trying to suggest that we have to just basically put blinders on. And I guess I'm just questioning why that would be. They obviously could have amended their complaint had they been given leave to do so, to add in those additional facts that we now know of, right? It is conceivable, yes, however, looking at the record as a whole, you know, if we're going to look ahead and say, well, what could have been obtained in discovery? We need to also ask what was obtained in discovery? There's the characterization of the Royal City House, for example. And the argument that the EEOC puts forward in, on the appeal and below was that, well, the growers each should have been on notice that there was something amiss that they should have caused them to investigate and discover violations of Title VII because the Department of Labor and Industries determined that a window on the second floor of a house where the H-2A workers were housed by Global was missing a screen. That was the violation on one house. A violation on another house of the, an example of what the EEOC has characterized below and appeal of deplorable living conditions are smoke detectors that were not present in every bedroom. I hope you're not here to say that the workers actually enjoyed the lap of luxury. I think that would be disgraceful. There is no dispute that the conditions they were forced to live in were deplorable. So I don't think you should stand there and waste time trying to say that all that was being complained of was a missing screen or a fire extinguisher. I think that's outrageous. The only question is whether your clients should be held responsible for the extremely egregious misconduct committed by Global. It seems to me that's the issue here. And that's the issue under Title VII. Right, but why would you stand there and try to minimize the deplorable conditions in which these workers were forced to live? I don't understand that in the least. I think it's not my intention at all to minimize that. Then what were you talking about, a missing screen or a non-working smoke detector? The inference that the EEOC would ask the district court to make and is asking this court to make on the overheating. The EEOC is pointing to declarations from some of the workers who said, no, we in fact complain directly to the growers about the conditions we were in, the fact that we didn't even have enough food to eat, that we told them that directly, told your clients that directly and nothing was done to address it. And at no point were actual specific and substantial facts supporting those conclusory allegations produced in discovery. There was no testimony by any claimant that on X day, at X hour on this property, I spoke with Y person and said the following, they understood me and they did nothing or they dismissed me. There's no evidence in the record of that nature. There is evidence, the declaration testimony that was just referred to suggesting that Valley Fruit Orchards was on notice because a claimant had told someone, it is a very conclusory statement stating, I told Valley Fruit, I complained about housing conditions. That's it. It doesn't say who. What about the Royal, is it Royal City? Is that the housing house that your client owned? That is a home that Valley Fruit owned and leased to Global. Valley Fruit had no relationship or landlord tenant relationship with the individual claimants. That was an independent lease. I thought that a Valley Fruit employee actually lived there with the workers. And so obviously would have been aware of whatever the conditions there were. And going to the merits of, okay, let's evaluate that under Title VII. If another employee of Valley Fruit were living on that property, how then were the Thai workers treated differently? What was the discriminatory conduct and was any of it based on race if, and there's no allegation that this other employee was Thai or wasn't Thai. There's no detail. There are no facts to support the inference that the EEOC is asking this court to make that knowledge, supposed theoretical knowledge of one thing that has nothing to do with race or national origin, has nothing to do with Title VII, leads to a Title VII. Let me interrupt you a minute. You switched from answering Judge Watford's question to talking about Title VII and whether or not there was a Title VII claim. But what you didn't answer, at least not to my satisfaction, is the fact that, let's go back to knowledge of the conditions. If there was an employee living in that house, the house was owned by the grower, okay? Now maybe he wasn't, you know, he wasn't directly leasing it. Somebody intervened in the lease. But shouldn't that be part of the economic reality of whether this person is a joint employer or not, the knowledge, the inference that can be made, just conditions. We're not talking now about the Title VII elements, just we're now only talking about whether that knowledge can be imputed to the grower. I will say there's nothing in the record to support an inference that the conditions at knowledge or a should have known, some indication that investigation was necessary. One of the, I think, realities that is overlooked and has been overlooked in this case is how heavily regulated this industry is. The Department of Labor and Industries, the Department of Labor, the Department of Homeland Security were all involved in this process that was required for Global Horizons to recruit workers and bring them to the United States and work throughout the United States. They worked in Washington, California, Hawaii, elsewhere throughout the United States. The Department of Labor and Industries, I, they inspected the housing and the violations they found were not, you know, out of the ordinary. They're in the record of, and I don't mean to minimize the experience that is alleged that these individuals experienced. I do not mean to minimize that. What I do mean to say is where is the inference that the violations that were actually found in the record of the housing conditions, smoke detectors, screens, the violations were not over flooding septic systems. The violations were not deplorable housing conditions. It was, this is unsafe because there's no smoke detector in every bedroom. There are, there are, there is one too many beds in this bedroom, global, you need to fix that. And they submitted a, they submitted a plan to the Department of Labor and Industries documenting how they were going to address these specific issues and Labor and Industries followed up. Can I ask you this, I think the only way the EEOC could prevail here is if there's something unique about this H2A program that, because normally an employer, you know, wouldn't have a responsibility for transportation and housing and, you know, providing food and the like, right? That would just be on the employees themselves. But is there something unique about the program that basically puts the obligation on you as the employer to provide each of those things? Now obviously you can delegate responsibility for that to somebody else, but I guess that's where I'm having trouble maybe with your client's position is that you kind of want to offload all of these responsibilities that the immigration program puts on you as the employer. And then basically just say, as long as we didn't know anything about it, we can't be held responsible. And I guess I question whether that's the right way to, to, to approach this. So the reality at work here is the H2A clearance order issued by the Department of Labor identified global horizons as the employer, Valley Fruit, Green Acre Farms, never employed these individuals. They were not involved in any of those non-orchard related activities that are placed so prominently in the EEOC's narrative about this case. Well, isn't there language in that H2A agreement that your growers have day-to-day control over the workers, day-to-day control? Couldn't that be deemed to be a kind of employer? And that is the, that is, we think the very sound distinction that the district court made as to activities on the orchard where each grower identified a need for work, pruning, tying, thinning, harvest, whatever it was, global had contracted to provide a workforce. And that workforce was comprised not only of the Thai H2A workers, it was comprised of domestic migrant and seasonal workers as well. And they were not Thai, obviously, they were domestic. So Valley Fruit and Green Acre Farms both retained discretion to identify work that needed to be done, but Global Horizons had absolute discretion about who would be transported, how they would be transported to the work site, who would actually do the work. Valley Fruit and Green Acre Farms actually never communicated directly with these H2A guest workers. They communicated with global supervisors who then communicated to the guest workers. Isn't there a dispute of fact about that? There is no dispute of fact that, um, I mean, I thought there were allegations that people, some of the workers, whether they were supervisors or the actual workers, spoke to people who said that some of these things were wrong, the housing, the lack of food. I mean, isn't there a dispute as to whether that happened or not? Again, I would say go back to the record and look at exactly what is allegedly in support of those allegations of workers complaining. The example provided by the EEOC today was of a declarant at summary judgment about whom the EEOC had produced a name and dates of work in discovery. The government in discovery had identified no specific allegations of conduct toward that worker, no racial slurs or epithets whatsoever for any worker. But at summary judgment, that individual declarant declared that in very vague and conclusory terms, I complained to Valley Fruit about the housing conditions. Again, where is the specific and substantial evidence necessary to get past summary judgment? That is a very vague and conclusory statement. We don't know when it happened, who they talked to, whether the individual actually understood them in English. Counsel, let me interject a question that kind of takes you backwards a step and I apologize for that. But before we get to summary judgment, could you explain again in your words why your clients contend that the allegations of the complaint itself within its four quarters are inadequate to satisfy a joint employer test? Because if the joint employer status applied, then I take it your clients would have to answer for the things that Global Horizons did. The four corners of the complaint can include the H-2A clearance order that delineates what Global was responsible for and what Valley Fruit and Green Acre would be responsible for. The responsibilities were clearly delineated. The 11th Circuit recently in the last 18 months or so decided a case, it was Consolidated Citrus, where this distinction between the H-2A obligations and the on-orchard obligations was recognized. This is not a case where Valley Fruit or Green Acre Farms ever issued payroll or had any role in payroll. They had no role in hiring these individuals. They never in the strict adverse employment action sense of firing someone or demoting someone, suspending someone from the workplace, they never had any role in that by contract. But in fact, that never occurred either. So it's difficult for the claimants here to get over that joint employer hump where the Global recruited, Global transported, Global housed, Global paid, Global provided subsistence. That was inadequate. The allegations in the complaint about Green Acre Farms and Valley Fruit are they set quotas, they made us work hard, and sometimes they yelled at us. There's no allegation of racial epithets, epithets or derogatory statements about Thailand or the people of Thailand, nothing against Valley Fruit or Green Acre Farms. The allegations are strictly related to orchard-related activities. Your time by the red light is up, but I'll give you another minute or two if you need it. Your Honors, I just want to reiterate that this was indeed, as the district court found, an exceptional case. From the start, the case should never have been filed with claims against Green Acre Farms and Valley Fruit. The interview statements of the claimants and the personal claimants or charging party personal statements that were part of the EEOC's investigative record before they filed suit, every single one consistently stated, no one made any derogatory comments about my race or national origin or religion. Consistently state in that breath, the complaints were consistently, I didn't get enough work, Global didn't pay me, Global owed me money. I left because I didn't want to, because I needed to earn more money because of my debt in Thailand. There were no allegations, no statements provided to the EEOC about Valley Fruit or Green Acre Farms. There were consistently no complaints about them. And that is the totality of the circumstances analysis that the district court engaged in on the Christian Bergarment motion for fees under Title VII. What did the EEOC know? Did they have a case when they filed the complaint? The question is not, did they conduct an adequate investigation? Did they conduct a reasonable, fantastic investigation or a lousy one? It's what was in the EEOC's file docket on this matter when the attorneys decided that they were going to file claims for a hostile work environment, retaliation, discrimination, disparate impact, or disparate treatment rather, constructive discharge. When those claims were filed against Valley Fruit and Green Acre Farms, did they have a case? And throughout the case- How do you respond to your opponent's point, which is obviously correct, that at least for half of the case or whatever we want to call the orchard related portion of it, I mean, that part of the case survived summary judgment. So how could the district court legitimately say that the entire action was just a, was completely frivolous? Because on the merits it was frivolous. Certainly there was a question about the orchard related activities, whether Valley Fruit or Green Acre Farms could be found by a reasonable jury to be a joint employer. The second step then is, what are the merits of the potential liability there? And there's simply nothing in the record implicating direct conduct by Valley Fruit or Green Acre Farms or conduct that they knew or should have known about that was within their area of control that they had, that they were negligent and not correcting in a manner or through means that were actually within their control. Everything was occurring that was complained about either in the past, at the time of recruitment, the housing decisions that Global made, transportation, Valley Fruit and Green Acre Farms did not control those issues. They didn't control those day-to-day activities. They did have influence, and we think the district court got it right on the motion to dismiss, and there was a pretty good argument at the end as well that a reasonable jury could find that for orchard related activities, assignments on where Global needed to bring their workforce, what the season, crop and weather dictated needed to happen on the orchards, those were decisions through the H-2A agreement and in fact in the evidence that were within Valley Fruit and Green Acre's discretion, and they exercised that discretion. But beyond that, they did not. Okay, counsel, I think you're over your extended time now. I am. If Judge Watford or Judge Rothstein have other questions, we'll go along further, but otherwise you should close I think. Thank you, Your Honor. Thank you. Kathy, just add, I said I would give Ms. Coleman like an extra minute or two, so why don't you add two minutes to her report. Thank you, Your Honor. Certainly there was evidence that the growers directly discriminated based on national origin, and for example, I'll go back to what I said about the quotas. It was the growers who set the quotas, and they were highly discriminatory. What they did to the Thai workers was outrageously beyond what the standard in the industry was. We also have a claimant, Promson, who worked for at least one day with the Mexican workers who said that work was easier. They weren't climbing ladders, and they weren't having to carry ladders by hand for three miles a day. To the extent that the growers are relying on what happened during pre-suit interviews, I have a few responses to that. One is that they are cherry-picking from those interview statements. Some of the statements, for example, what they're alleging are inconsistencies referred to statements about what happened on other farms, not on the Apeliz farms. Additionally, they only point to a handful of statements. There were other pre-interview statements where claimants did complain about the conditions. But more importantly, I would say that, again, this happened during our administrative investigation. These statements were not sworn testimony. They involved non-official interpreters working over a telephone. There are a lot of reasons why a jury faced with those statements and faced with subsequent declarations could make a credibility determination that what happened, the declarations, which happened later and which the claimants read in Thai, translated by professional interpreters before they signed them, that those were more credible, and certainly they would be testifying at trial as well. With respect to discovery, we were limited in what we were able to ask for. The district court had said that everything that happened off the orchards was irrelevant, so we couldn't probe into that. To the extent that the Apeliz are saying we came up with things not until after they moved for summary judgment, how is that fair? I will point out that discovery was still open when the growers moved for summary judgment. They cut it off. They could have kept going. In fact, they even canceled one of their scheduled depositions. The growers are saying that the EEOC did not come up with sufficiently specific facts. They want to know when Narang Srinongkot, for example, went and talked to the growers. Who specifically did he talk to and on what date and what specifically did they say? These are not, that's not necessary. A jury could listen to his testimony and say he complained. They knew. And they also knew because they went and they visited the houses. Can I just back you up just to your theory for why the growers were joint employers as to the non-orchard related matters? Does it hinge on the unique nature of the H-2A program or on the theory, I guess, that because the admission of these workers is conditioned upon somebody in the U.S. providing them with transportation, housing, and the like, that basically an employer really cannot delegate those responsibilities in the way that the growers tried to do here? Is that the EEOC's position? That's not exactly the EEOC's position. I think a helpful way to think about joint employers is was there shared control over the employees in their terms and conditions of employment, whatever those terms and conditions were, shared control over employees? And here the district court said there was a jury question on that. Now once you have said there, with respect to the orchard, correct. I'm not. Just forget about that. I'm talking about the non. I'm trying to figure out your theory for why they are joint employers as to non-orchard related matters. Right. So I'm sorry. If you can bear with me for just a minute, that's where I was trying to go. So if the growers did have some shared control, then the question moves to liability. What can they be liable for? Can they be liable for conduct only on the orchard? Can they be liable for all the conduct that these employees, as terms and conditions of their employment, were subjected to? And the answer to that turns on what they knew or should have known, and then was it within their power to correct violations? But no. Because that's what I'm saying. Outside of the H-2A program, right? Let's say that I own a farm, and I hire an independent contractor, like Global, to go out and recruit the workers, right? And in the normal scheme of things, I would have no interest, responsibility whatsoever in where they live, what kind of food they get. That's none of my business, right? And so that's what I'm asking. Ordinarily, outside of this unique program, I would not think of the employer. Just because I contracted with this Global outfit, that I would then all of a sudden be liable for if they're not getting adequate food, if they have inadequate shelter? Why would I be liable for that? Yes. And I'm sorry. Maybe I misunderstood your question. That's exactly right. And the growers went into this arrangement knowing that they were bringing over impoverished foreign workers who needed to be housed, who needed to be fed. And that was part of what had to happen. And so someone had to be responsible for that. On paper, they said, not us, hands off. But as... But in fact, that's what I'm saying. Put aside this Royal City thing, because maybe that's slightly unique. But other than that, I don't think we have anything that suggests that the growers were directing Global as to where to house these folks, what kinds of housing they were to be provided, how much food they were to get. I don't... I didn't see one scrap of evidence that suggested that the growers had anything to do with that. So that's why I was asking, is your theory just that, well, you know, if we were outside the H-2A program, you know, obviously they wouldn't be joint employers. But because that's a condition of the admission of the workers, that suddenly they're just not able to, you know, contract in the way that they did with Global and say, hey, none of that's our responsibility. We're just going to, you know, keep blinders on and focus on the orchard stuff. Well, yes. That's highly relevant. Now, certainly we're not suing for violations of the H-2A program, we're suing for violations of Title VII. But, you know, again, as part of the totality of factors of the relationship that the court should be looking at to assess joint employer liability, that is part of the economic reality factor. And to that extent, the fact that these claimants were so completely economically dependent, that, you know, the question of joint control is, is there sufficient joint control to hold them liable? It doesn't have to be a lot of joint control. It just means, is there sufficient? And the economic reality here, because of the H-2A program, means that perhaps you need it a lower level than what you would need in another context. Can I ask another basic factual question, you'll have to educate me on this, in terms of how the H-2A program works? Do, were those workers who came from Thailand, were they allowed to work on other farms other than these two? No, it is farm-specific. So, okay, so Global is their employer, and that's how that's arranged when they come over, but they, as part of their admission, they're only allowed to work on either, well, I can't remember the names of these two things, but the two different farms, that's the only, those are the only two farms they can work on? That's correct. It's tied to their application, and the farms had to certify that they were unable to get sufficient domestic labor in order to bring over these claimants. I see. Okay. So why, I thought, that's helpful, but I thought there were references in the record to Global saying to the workers, you know, I don't know, like, if you don't do X or Y, we're not going to send you back out to either of these two places, you might have to get shunted off to what I assume was some less desirable places. That's not the case? Well, I think there is evidence in the record, and actually, I don't know what, there is evidence in the record that they said that. There's also evidence in the record that they simply threatened to deport them if they weren't happy with them, but some of these, you know, they were tied to either Green Acre or to Valley Fruit, and Global was shuffling them back and forth between the two. Global had an enormous number of different kinds of H-2A violations, and this may very well have been one of them. Got it. Okay. Thank you. Counsel, I'm afraid you're over your extended time as well, so I've been a poor presiding judge, but I appreciated the arguments. Thank you, Your Honors. Both sides. This EOCV Global Horizons case shall be
judges: Gould, Watford, Rothstein